UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**SOUTHERN COAST K9, LLC, and 360 SECURITY PARTNERS, LLC,**

**Plaintiffs,**

**v.** **Case No. 6:25-cv-298-JA-LHP**

**MARGUERITE HEISER and WILLIAM HEISER,**

**Defendants.**

# ORDER

This case arises from the parties' former business arrangements in the dog-training industry. These arrangements were complicated and involved multiple transactions, resulting in myriad claims from both sides against each other. Plaintiffs, Southern Coast K9, LLC (Southern Coast) and 360 Security Partners, LLC (360 Security), bring eight claims against Defendants, Marguerite (Peggy) Heiser and William (Bill) Heiser (together, the Heisers). (Second Am. Compl., Doc. 60). Plaintiffs' claims arise from Peggy's[1] alleged breaches of a Purchase and Sale Agreement (Purchase Agreement, Doc. 60-1)

[1] To avoid confusion, the Court uses first names when referring to the Heisers individually.

and Bill's alleged breaches of an Independent Contractor Agreement (Doc. 60-2), as well as claims sounding in tort and equity. In return, the Heisers lodge five counterclaims against Plaintiffs, including allegations that Southern Coast breached the Independent Contractor Agreement and that Southern Coast, 360 Security, and 360 Security's principal, Christina Liepold, engaged in tortious conduct. (Am. Countercl., Doc. 97).[2]

Now before the Court are the Heisers' motion for summary judgment (Doc. 113), Plaintiffs' motions for summary judgment (Docs. 114 & 115), and the responses (Docs. 118, 119, & 120) and replies (Docs. 121, 122, & 123) thereto. Based on the Court's review of the parties' submissions, 360 Security's motion must be denied and the Heisers' and Southern Coast's motions must each be granted in part and denied in part.

## I. BACKGROUND

Southern Coast is a dog-training business specializing in procuring and training working dogs to sell to law enforcement and private security services. (Doc. 113-14 at 2). For many years, Peggy and Bill owned and operated Southern Coast at a facility in New Smyrna Beach, Florida. (Doc. 113-6 at 1). Peggy held a majority share of Coast to Coast K9 Teams LLC (Coast to Coast)—the entity

---

[2] The Heisers' third counterclaim—for defamation—is brought against Southern Coast, 360 Security, and Liepold. (*See* Doc. 97 at 8–11). No party moved for summary judgment on this claim.

that wholly owned Southern Coast. (*See* Doc. 60-1 at 5, 131; Doc. 113-1 at 134; Doc. 113-3 at 47:5–9). Bill did not technically hold a share of either business but controlled Southern Coast's day-to-day operations. (Doc. 113-1 at 134; 113-5 at 29:14–18).

Under the impression that the Heisers soon planned to retire, 360 Security—an investment company formed by Texas residents Jason Pinson and Christina Liepold—approached the Heisers about acquiring Southern Coast and its parent company, Coast to Coast. (Doc. 60-1 at 3–4, 124–26; Doc. 113-1 at 5:3–8). In August 2020, Peggy agreed to sell Southern Coast and Coast to Coast to 360 Security under terms memorialized in the Purchase Agreement. (*See* Doc. 60-1). Among other things, the Purchase Agreement required that Peggy convey to 360 Security all assets necessary to conduct Southern Coast's business, abide by a noncompetition covenant, and pledge that Southern Coast was not operating in violation of the law at the time of the sale. (*Id.* at 12, 15).

360 Security hired Bill as president of Southern Coast, tasking him with managing the day-to-day operations of Southern Coast while Liepold and Pinson continued to reside in Texas. (Doc. 113-1 at 36:2–9; Doc. 115-3 at 69:18–25). Liepold, through her company Liepold, Harrison and Associates, exercised control over Southern Coast's accounting and human resources. (Doc. 113-4 at 7:19–8:6, 11:10–12:2, 71:15–19). After the sale, 360 Security reorganized the companies' ownership structure so that Southern Coast was no longer owned by

Coast to Coast, but the businesses' financials remained closely intertwined. (Doc. 113-14 at 6).

Southern Coast continued to employ Bill as its president from August 2020 until June 2022, when Southern Coast and Bill agreed that Bill would thereafter serve as an independent contractor under new terms set forth in the Independent Contractor Agreement. (Doc. 60-2). Bill continued managing the day-to-day operations at Southern Coast under the Independent Contractor Agreement until September 30, 2023, when he stopped doing work for Southern Coast.[3] (*See* Doc. 113-5 at 224). Each side accuses the other of contractual violations and tortious conduct. There are several dimensions to their dispute.

### A. Ownership of the American Detection Canine Association

Section 3.15 of the Purchase Agreement required Peggy to convey to 360 Security "all the assets and properties necessary to permit [360 Security] to conduct [Southern Coast's] business and operate in the same manner as [Southern Coast's] business is being conducted and is being operated on the date" of the Purchase Agreement. (Doc. 60-1 at 12–13).

At the time of the Purchase Agreement, Southern Coast performed canine certifications as a "secondary" component of its business through the American

[3] In their briefs, the Heisers state that Bill "retired" (Doc. 113 at 3) whereas Southern Coast asserts that Bill was "terminat[ed]" (Doc. 115 at 4). The nature of Bill's departure from Southern Coast is not at issue in the parties' motions; thus, the Court will not address it further.

Detection Canine Association (ADCA), an independent legal entity that predates the founding of Southern Coast. (Doc. 113-5 at 42:3–10; Doc. 113-7 ¶¶ 5–8; Doc. 115-3 at 154:7–14, 156:24–157:4). Canine certification entails a series of simulations testing the dog's training and capabilities. (Doc. 115-1 ¶ 6). Upon successful completion of the simulations, the dog is awarded a physical certificate that confirms the dog's competence. (Doc. 115-1 ¶ 6; Doc. 115-6 at 15:5–16:5; Doc. 115-7 at 33:7–35:6). Certified dogs are considered more credible in the industry. (Doc. 113-11 at 76:4–22; Doc. 113-12 at 40:6–41:16). After a dog is certified, it may be periodically re-certified as a quality-control measure. (Doc. 113-12 at 40:8–25). ADCA is just one of numerous canine-certification businesses on the market. (Doc. 113-3 at 44:8–25).

The parties dispute who owns ADCA. Bill claims that he is the sole owner of ADCA and that Peggy had no right to transfer ADCA to 360 Security in the Purchase Agreement. (*See, e.g.*, Doc. 113-4 at 10:22–11:3, 63:21–64:4, 67:23–68:3; Doc. 113-7 ¶ 4). Bill is listed as ADCA's registered agent on Florida's Sunbiz records. (Doc. 114-2 ¶ 16). Although 360 Security knew of ADCA's certification program at the time it negotiated the Purchase Agreement, ADCA is not explicitly referenced in the Purchase Agreement. (*See generally* Doc. 60-1; Doc. 113-2 at 14:14–23). In late 2023, after Bill stopped doing work for Southern Coast, he began operating ADCA independently of 360 Security. (Doc. 114-4 at 152:11–14).

During Bill's tenure at Southern Coast, ADCA operated on Southern Coast's property and used Southern Coast's employees and logo, and Southern Coast insured and funded ADCA and collected ADCA's revenue. (Doc. 115-1 ¶ 6; Doc. 115-3 at 156:24–157:4). Moreover, ADCA invoices identified ADCA as Southern Coast's "in-house" certification business. (Doc. 115-1 ¶ 7). Peggy, using a Southern Coast email address, directed Southern Coast employees to file ADCA's annual report and pay ADCA's fees. (*Id.* ¶ 12). Southern Coast never paid Bill individually for ADCA certifications while he was employed by Southern Coast. (*Id.* ¶ 17; Doc. 114-4 at 163:12–23). 360 Security maintains that it owns ADCA under the Purchase Agreement and that Bill's continued operation of ADCA is unlawful. (Doc. 60 ¶ 87).

### B. The Heisers' Certification Business

Section 5.2 of the Purchase Agreement provides that Peggy shall not "engage in or assist any other [p]erson to engage in any business that is competitive with [Southern Coast's] business." (Doc. 60-1 at 15). Peggy further agreed to refrain from "solicit[ing] or endeavor[ing] to entice away from [360 Security] . . . any [p]erson who is . . . a customer . . . having a material business relationship with [Southern Coast] or [its] business[]." (*Id.*). And the Independent Contractor Agreement required Bill to "transition[] the management of operations" to Southern Coast. (Doc. 97-2 at 4–5).

Walt Disney World (Disney) is one of Southern Coast's major clients. (Doc. 114-2 ¶ 20). Historically, the Heisers performed certifications for Disney's dogs through ADCA and periodically re-certified Disney's dogs. (*Id.*). The Heisers billed Disney through Southern Coast's Disney vendor account. (Doc. 113-15 at 17:8–18:11, 97:5–15).

After Bill left Southern Coast, the Heisers continued to perform certifications for Disney's dogs through ADCA without involving Southern Coast. (*Id.* at 76:15–77:25). To do so, the Heisers created a new vendor account with Disney exclusively for ADCA and began issuing invoices under a new ADCA logo. (*Id.* at 21:12–20, 76:15–77:25, 79:8–80:19). In 2024, the Heisers changed ADCA's principal address and registered address from Southern Coast's address to the Heisers' personal address. (Doc. 114-2 ¶ 16; Doc. 114-4 at 11:1–7). Bill continues to operate ADCA and has issued ADCA invoices to Disney in 2026. (Doc. 114-2 ¶ 23). 360 Security asserts that the Heisers' conduct is in violation of Section 5.2 of the Purchase Agreement. (Doc. 60 ¶¶ 92–93).

### C. Zoning Issues at the Southern Coast Facility

In Section 3.12 of the Purchase Agreement, Peggy affirmed that at the time of the sale, Southern Coast's business "as . . . currently conducted" did not violate any "law, statute, ordinance, regulation, rule, order, judgment or decree of any Governmental Authority." (Doc. 60-1 at 12).

One hundred dogs lived at the Southern Coast facility at the time the parties entered into the Purchase Agreement. (Doc. 120-2 at 14:2–25, 15:1–6; Doc. 120-8 ¶ 14). During the negotiation of the Purchase Agreement, Pinson discovered that the Southern Coast facility was not properly zoned to house 100 dogs. (Doc. 113-1 at 8:11–9:10). 360 Security proceeded with the sale after Bill assured Pinson that the zoning irregularity was insignificant and would soon be resolved. (*Id.* at 9:11–15; Doc. 113-5 at 13:7–14:8).

In September 2024, Volusia County issued a Final Site Plan Development Order requiring that the number of dogs on the property be reduced from 100 to 30. (Doc. 113-6; Doc. 120-8 ¶ 16). The Volusia County Council thereafter denied Plaintiffs' appeal of the Order. (Doc. 113-6 at 10–12). As a result, Southern Coast was forced to operate with only a fraction of the dogs that it intended to house at the time of the Purchase Agreement. 360 Security claims that it suffered lost profits and diminution in value to its business because Peggy conveyed Southern Coast to 360 Security under circumstances that violated applicable zoning law and in breach of Section 3.12 of the Purchase Agreement. (Doc. 60 ¶ 108).

### D. Bill's Drug Enforcement Agency License and Florida Department of Law Enforcement Registration

Bill held a Drug Enforcement Agency (DEA) license throughout his tenure at Southern Coast, allowing him to lawfully store narcotics at the Southern

Coast facility to assist in training drug-detection dogs. (Doc. 113-9 at 36:10–25; Doc. 97-1). In the "Statement of Work" attached as Exhibit A to the Independent Contractor Agreement, Bill agreed to "transition[] . . . any applicable DEA and other licenses and contracts" to Southern Coast. (Doc. 60-2 at 4–5). But Bill never transferred his DEA license to Southern Coast, claiming that transfer of a DEA license is not permitted. (Doc. 113-7 ¶ 14). Southern Coast asserts that Bill violated the Independent Contractor Agreement by failing to transfer his DEA license. (Doc. 60 ¶ 117). Southern Coast ultimately obtained a DEA license after Bill stopped working for Southern Coast. (*See* Doc. 113-11 at 114).

Historically, Southern Coast included Bill's DEA license number and Florida Department of Law Enforcement (FDLE)-certified canine-instructor number in the bottom left-hand corner of Southern Coast-issued canine certificates as part of a template that Bill created. (Doc. 115-1 ¶¶ 6, 8; Doc. 115-3 at 156:24–158:3, 159:3–160:12). Those numbers are unique to Bill. (*Id.* at 148:5–24). After Bill stopped working for the company, Southern Coast continued to use the same certificate template, including Bill's DEA and FDLE numbers in the bottom left-hand corner. (*Id.* at 151:1–9). Once Bill complained, Southern Coast removed Bill's DEA and FDLE numbers from its certificates. (Doc. 115-1 ¶ 10). Bill maintains that Plaintiffs' use of his DEA and FDLE numbers constitutes a conversion of his property and that Plaintiffs were unjustly enriched by their conduct. (Doc. 97 ¶¶ 67–77).

### E. Bill's Alleged Entitlement to Southern Coast's Profits

The Independent Contractor Agreement calls for Southern Coast to compensate Bill as set forth in the Statement of Work, which is included as Exhibit A to the Independent Contractor Agreement. (Doc. 115-1 ¶¶ 12–13; Doc. 115-3 at 118:4–10). In the section of the Statement of Work labeled "Consultancy Hours and Fees," Bill's "hours and rates" are set by a Letter of Intent dated September 24, 2021. (Doc. 97-2 at 5–7). The Letter of Intent states that Bill shall receive an annual salary of $75,000 to work no more than three 8-hour workdays per week. (*Id.* at 5). The Letter of Intent also contemplates that Bill receive "a profit-share of 50% based on the weighted average of both the prior quarter and the prior 12 months" that may be paid as a bonus. (*Id.*). The Letter of Intent further states that "[t]he calculation of the profit share, the working capital threshold, and the means for Jason Pinson to recoup his initial investment shall be agreed upon by the parties after the final accounting reconciliation is complete." (*Id.*).

Bill claims that he is entitled to a share of Southern Coast's annual profits pursuant to the Letter of Intent as incorporated in the Independent Contractor Agreement. Bill testified in his deposition that the Letter of Intent's profit-share language also reflects an oral agreement that he made with Pinson. (Doc. 115-3 at 110:23–112:1). At one point, Pinson approved a $75,000 bonus for Bill that was allegedly based on Southern Coast's profits in 2021, but Bill maintains that

this only partially covers the remuneration that Southern Coast owes him. (Doc. 113-7 ¶¶ 7–13; Doc. 113-5 at 52:3–12; Doc. 119-5 at 54:13–23; 55:15–25).

**F. INL Contract and the Human-Trafficking Investigation**

Coast to Coast held a contract (INL contract) with the Bureau of International Narcotics and Law Enforcement Affairs for the production of drug-detection dogs. (*See* Doc. 113-5 at 62:17–63:6). To fulfill the INL contract, Bill hired undocumented immigrants to work as "independent contractors" for Southern Coast. (Doc. 113-5 at 69:1–8; Doc. 113-10 at 33:13–17). Five undocumented workers lived at the Southern Coast facility in small sheds without indoor plumbing or bathrooms. (Doc. 113-4 at 21:14-23, 76:18-25; Doc. 113-5 at 62:4–11; Doc. 113-17 at 16:11–18). Although Liepold knew as early as 2020 that Southern Coast did not have residency documentation for some of its noncitizen employees, she claims Bill led her to believe that Southern Coast's noncitizen workers were lawfully present in the United States on a visa program. (Doc. 113-3 at 28:7–23; Doc. 113-4 at 83:15–21; Doc. 113-5 at 61:17–20).

Southern Coast's unlawful use of undocumented workers was discovered by the United States Department of State in 2023 during a human-trafficking investigation. (Doc. 113-5 at 71:18–22; Doc. 113-10 at 57:11–19). Southern Coast claims that it was forced to terminate its lead trainer following the human-trafficking inquiry. (Doc. 113-5 at 72:13–19). Afterward, 360 Security sold Coast

to Coast and the INL contract to another canine-training company at what 360 Security characterizes as a "fire sale" price. (*Id.* at 62:24–63:6; 72:10–73:9). 360 Security seeks to recover revenue that it claims it lost as a result of Bill's alleged misconduct. (Doc. 60 ¶ 145).

### G. Bill's Alleged Abuses of His Position as President of Southern Coast

Southern Coast accuses Bill of multiple breaches of fiduciary duty as its president between the August 2020 sale and the June 2022 Independent Contractor Agreement. (Doc. 60 ¶¶ 127–132). These breaches include Bill's alleged tampering with Southern Coast's dogs' "canine passports"—the documentation of a dog's age and breeding. (*See* Doc. 114-4 at 136). Bill also purportedly provided unauthorized discounts to his preferred customers, refused to raise prices when doing so was in Southern Coast's best interest, took inflated bonuses for himself, hired undocumented immigrants, turned away business from Southern Coast without justification, and used Southern Coast's resources for his own personal projects. (Doc. 60 ¶¶ 127–132; Doc. 120-7 ¶¶ 14–19). 360 Security claims that it was unaware of Bill's purported conduct until after he stopped working for Southern Coast. (Doc. 120-8 ¶ 17).

### H. The Heisers' Alleged Interference in Southern Coast's Contracts

In late 2023, Bill allegedly instructed former Southern Coast employee Tony Silva to inform Disney that Bill would handle all certifications moving

forward without involvement from Southern Coast. (Doc. 120-6 ¶ 8). Southern Coast claims damages for lost business as a result of Bill's actions. (Doc. 60 ¶¶ 159–171).

Moreover, Southern Coast purportedly held a contract with MSC Cruises USA, a South Florida cruise line. (*See* Doc. 60 ¶¶ 165–170; Doc. 113-3 at 22:1–7). Southern Coast asserts that after the Independent Contractor Agreement was terminated, Bill—aware of the contract details due to his position with Southern Coast—divulged the terms of the deal between Southern Coast and MSC Cruises to his personal friend, Tony Guzman, the operator of a competing canine business. (Doc. 60 ¶ 165; Doc. 113-3 at 22:1–24). Southern Coast claims that it was forced to sell the MSC Cruises contract because Guzman would have used the information Bill gave him to underbid Southern Coast. (Doc. 113-5 at 37:3–12). Southern Coast seeks to recover lost profits that it claims it would have received under the MSC Cruises contract. (Doc. 60 ¶¶ 170–71).

### I. The Heisers' Alleged Conversion of Southern Coast's Funds from a Brevard County Seminar

After leaving Southern Coast, Bill worked with Sergeant Jerry Shealy of the Brevard County Sheriff's Office to put on the 2023 Space Coast Explosive & Drug Detection Canine Seminar (the seminar) in Brevard County, Florida. (Doc. 113-18 at 13:11–14, 14:3–21). The Brevard County Sheriff's Office agreed to provide the venue and food, and Southern Coast claims to have provided

trainers for the seminar. (*Id.* at 16:12–17:13, 34:4–6; Doc. 120-4 at 53:7–9). Bill set up a new Square account to accept credit card payments for the seminar rather than using Southern Coast's pre-existing Square account. (*Id.* at 31:6–17). Bill labeled the new Square account "Southern Coast K9 Seminar," and he transferred some of the proceeds from the Square account to his personal bank account. (*See* Doc. 120-9 at 206:14–20). The Heisers purportedly profited more than twenty thousand dollars in registration fees that Southern Coast claims it should have received. (Doc. 113-5 at 85:17–23).

## II. LEGAL STANDARDS

On a motion for summary judgment, a district court views "all facts and reasonable inferences in the light most favorable to the nonmoving party." *Wesson v. Huntsman Corp.*, 206 F.3d 1150, 1152 (11th Cir. 2000). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party," and a fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The movant "bears the initial responsibility of informing the district court of the basis for its motion" and "identifying those portions" of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant demonstrates the absence of a genuine issue of material fact, "[t]he burden then shifts to the non[]moving party" to "present affirmative evidence to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006). To defeat the motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (quoting *Bricklayers Int'l Union, Local 15 v. Stuart Plastering Co.*, 512 F.2d 1017, 1023 (5th Cir. 1975)). Cross-motions may, however, "be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts." *Id.* at 1555–56 (quoting *Bricklayers Int'l Union,* 512 F.2d at 1023).

## III. DISCUSSION

### A. 360 Security's Claims for Breach of the Purchase Agreement Against Peggy

In Count I, 360 Security claims that Peggy breached the Purchase Agreement by (1) failing to convey ADCA to 360 Security as allegedly required by Section 3.15; (2) performing certifications and soliciting Disney in violation of the noncompetition and nonsolicitation provision in Section 5.2; and (3) conveying Southern Coast to 360 Security under circumstances that violated applicable zoning law, in contravention of Section 3.12. 360 Security further seeks a declaratory judgment (Count IX) that it owns ADCA. Peggy moves for summary judgment on each of these claims. 360 Security cross-moves for summary judgment on its claim for breach of the Purchase Agreement insofar as it concerns the ADCA and on its declaratory judgment claim. (Doc. 114).

The Purchase Agreement is governed by Delaware law. (Doc. 60-1 at 23). "To prevail on a claim for breach of contract [under Delaware law], the [claimant] must establish by a preponderance of the evidence that: (1) a contract existed between the parties; (2) the [opposing party] breached [her] obligation imposed by the contract, and (3) [the claimant] suffered damages as a result of the [opposing party]'s breach." *Lucas v. Stephens*, No. CV CPU4-16-001271, 2017 WL 1497881, at *2 n.9 (Del. Com. Pl. Apr. 26, 2017) (citing *VLIW Tech., LLC v. Hewlett–Packard Co.*, 840 A.2d 606, 612 (Del. 2003)). "Because Delaware

adheres to the objective theory of contract interpretation, the court initially looks to the contract itself in an effort to give effect to the 'clear language' of that document." *Julian v. Julian*, No. CIV.A. 1892-VCP, 2010 WL 1068192, at *4 (Del. Ch. Mar. 22, 2010) (citing *Seidensticker v. Gasparilla Inn, Inc.*, Case No. 2007 WL 4054473, at *2 (Del. Ch. Nov. 8, 2007), and *In re Buonamici*, Case No. 2008 WL 3522429, at *7 (Del. Ch. Aug. 11, 2008)). "The words of the contract will be deemed ambiguous only where the language is susceptible to two or more reasonable interpretations." *Id.* (collecting cases).

"If the language of an agreement is ambiguous, then the court 'may consider extrinsic evidence to resolve the ambiguity.'" *Am. Healthcare Admin. Servs., Inc. v. Aizen*, 285 A.3d 461, 476 (Del. Ch. 2022) (quoting *Salamone v. Gorman*, 106 A.3d 354 (Del. 2014)). "A court may consider 'evidence of prior agreements and communications of the parties as well as trade usage or course of dealing.'" *Id.* (quoting *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1233 (Del. 1997)). "When the terms of an agreement are ambiguous, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement." *Id.* (quoting *Sun-Times Media Grp. v. Black*, 954 A.2d 380, 398 (Del. Ch. 2008)). "[I]n a dispute over the proper interpretation of a contract, summary judgment may not be awarded if the language is ambiguous and the moving party has failed to offer uncontested

evidence as to the proper interpretation." *GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 784 (Del. 2012).

*1. ADCA (Counts I & IX)*

Both 360 Security and the Heisers seek summary judgment in their favor regarding 360 Security's claim of ownership of ADCA under the Purchase Agreement. (Doc. 60 ¶¶ 85–91). Upon review, the Court finds that the contract language and the parties' subsequent conduct is ambiguous, precluding entry of summary judgment on this issue.

Section 3.15 of the Purchase Agreement states as follows:

> Section 3.15 <u>Assets of Companies; Ownership Interests; Subsidiaries</u> [Southern Coast] owns good, valid and marketable title in and to, or has a valid leasehold or licensed interest in, all of the assets described on Schedule 3.15(a) . . . free and clear of all [l]iens, and upon the consummation of the [c]losing, [Southern Coast's assets] will comprise all the assets and properties necessary to permit [360 Security] to conduct [Southern Coast's] business and operate in the same manner as [Southern Coast's] business is being conducted and is being operated on the date hereof and at the [c]losing [d]ate.

(Doc. 60-1 at 12–13). 360 Security asserts that it is entitled to summary judgment because Section 3.15 is "dispositive" and unambiguously includes the transfer of ADCA. (Doc. 122 at 2). But the Heisers contend that summary judgment is warranted in their favor because ADCA is neither explicitly referenced anywhere in the Purchase Agreement nor "necessary" to running

Southern Coast's dog-training business. (Doc. 113 at 13).

The disclosure schedule set forth in Schedule 3.15(a) does not list ADCA among the assets scheduled for transfer under the Purchase Agreement. (*See* Doc. 60-1 at 22–45). The omission of ADCA from the disclosure schedule is arguably consistent with the Heisers' position that the parties did not understand ADCA to be part of the sale. And this position is further supported by the fact that no party to the Purchase Agreement claims to have owned ADCA before the sale.

But the language of Section 3.15—that 360 Security is entitled to all assets "necessary" for operating Southern Coast "in the same manner as [Southern Coast's] business is being conducted" on the date of the Purchase Agreement—is broad enough to potentially encompass ADCA. Many key terms in the Purchase Agreement are not fully defined, including Southern Coast's "assets," and the Purchase Agreement is silent about how the parties understood the scope of Southern Coast's "business." Although certification services were a "secondary" component of Southern Coast's business, a secondary component of a business could be necessary to operate "in the same manner" as before the sale. (*See* Doc. 113-5 at 42:3–10). The at-issue language is reasonably susceptible to different interpretations. *See Julian*, 2010 WL 1068192, at *4. Therefore, the contract is ambiguous. *See GMG Cap. Invs.*, 36

A.3d at 784; *Motorola, Inc. v. Amkor Techs., Inc.*, 849 A.2d 931, 937–38 (Del. 2004).

360 Security points to the parties' post-sale conduct as dispositive evidence that 360 Security owns ADCA. The operations of ADCA and Southern Coast were closely intertwined during Bill's tenure at Southern Coast. ADCA operated at the Southern Coast facility, and Southern Coast's invoices to customers identified ADCA as Southern Coast's "in-house" certification program. (Doc. 114-2 ¶¶ 7, 9, 15). Southern Coast collected all revenue generated by ADCA and paid ADCA's expenses, including the registration fee required by the Florida Secretary of State. (Doc. 114-1 ¶ 8; Doc. 114-2 ¶¶ 11–12; Doc. 114-4 at 163:12–23). And Southern Coast permitted ADCA to use Southern Coast's employees to carry out certifications. (Doc. 114-2 ¶¶ 12–13).

The parties' post-sale conduct does not show the absence of a dispute of material fact regarding ownership of ADCA. Although 360 Security imparted some concrete benefits to ADCA, its actions do not necessarily imply an understanding of ownership. It is plausible that Southern Coast's contributions to ADCA reflected Bill's involvement in both companies. The extrinsic evidence that 360 Security points to of the parties' post-sale conduct is not conclusive. *See Salamone*, 106 A.3d at 376 (considering extrinsic evidence to an ambiguous contract and determining that it does not resolve the ambiguity).

Both parties' summary-judgment motions must be denied as to ownership of ADCA because genuine issues of material fact remain as to whether ADCA was included in the Purchase Agreement. Summary judgment must therefore be denied as to 360 Security's declaratory judgment claim as well. *See S. Owners Ins. Co. v. Galati Yacht Sales, LLC,* 653 F. Supp. 3d 1147, 1157 (M.D. Fla. 2023) (explaining that genuine disputes of fact preclude entry of declaratory judgment).

*2. Noncompetition and Nonsolicitation*

Section 5.2 of the Purchase Agreement contains the following noncompetition covenant:

> For a period of five (5) years from the date hereof . . . [the Heisers] shall . . . not [] (i) transact business directly or indirectly . . . or otherwise[] engage in or assist any other [p]erson to engage in any business that is competitive with . . . [Southern Coast] . . . or permit [the Heisers'] name to be used in connection with[] any business anywhere in the world which is engaged . . . in the business of developing, marketing or providing canine detection teams, canine patrol, training, security management or working dog sales . . . .

(Doc. 60-1 at 15). Section 5.2 also contains a nonsolicitation provision in which Peggy covenanted not to:

> (ii) directly or indirectly[] solicit or endeavor to entice away from [360 Security] . . . or otherwise interfere with the business relationship of [360 Security] with[] any [p]erson who is, or was within the two-year period prior thereto, a customer or employee of, consultant or

> supplier to, or other p]erson having a material business relationship with [Southern Coast] . . . .

(*Id.*). 360 Security alleges that Peggy violated this provision because of her involvement in the Heisers' continued operation of ADCA, which allegedly included solicitation of certification business from Disney that otherwise would have gone to Southern Coast. (Doc. 60 at ¶¶ 93–94).

Peggy states that she did not engage in any of the activities listed in Section 5.2 as activities violating the noncompetition or nonsolicitation provisions, including "canine-detection teams, canine patrol, training, security management, and working-dog sales." (Doc. 60-1 at 15). Peggy contends that certifications—only a secondary component of Southern Coast's business—should not be read to fall under Section 5.2's list of competitive activities.

"While Delaware is a contractarian state, 'Delaware courts do not "mechanically" enforce non-competes.'" *Hub Grp., Inc. v. Knoll*, No. 2024-0471-SG, 2024 WL 3453863, at *7 (Del. Ch. July 18, 2024) (quoting *FP UC Holdings, LLC v. Hamilton*, No. CV 2019-1029-JRS, 2020 WL 1492783, at *6 (Del. Ch. Mar. 27, 2020)). "Instead, Delaware courts 'closely scrutinize[] [noncompetes] as restrictive of trade.'" *Weil Holdings II, LLC v. Alexander*, No. 2024-0388-BWD, 2025 WL 689191, at *4 (Del. Ch. Mar. 4, 2025) (alterations in original) (quoting *Faw, Casson & Co. v. Cranston*, 375 A.2d 463, 466 (Del. Ch. 1977)), *aff'd*, 350 A.3d 640 (Del. 2025).

Courts applying Delaware law must assess noncompetition and nonsolicitation agreements to "ensure that they . . . (i) [are] reasonable in geographic scope and temporal duration, (ii) advance legitimate economic interests of the party seeking enforcement, and (iii) survive a balancing of the equities." *Sunder Energy, LLC v. Jackson*, 332 A.3d 472, 485 (Del. 2024). "Generally, covenants not to compete in the context of a business sale are subject to a 'less searching' inquiry than if the covenant 'had been contained in an employment contract.'" *Kodiak Bldg. Partners, LLC v. Adams*, No. 2022-0311-MTZ, 2022 WL 5240507, at *4 (Del. Ch. Oct. 6, 2022) (quoting *Tristate Courier & Carriage, Inc. v. Berryman*, No. C.A. 20574-NC, 2004 WL 835886, at *10 (Del. Ch. Apr. 15, 2004)).

Genuine disputes of material fact remain as to the nature of Southern Coast's certification business, including whether 360 Security is the rightful owner of ADCA. Although certification is not listed in Section 5.2 as being competitive with Southern Coast, the Heisers have not shown that Section 5.2's list of competitive activities is exhaustive. Accordingly, the Heisers' motion for summary judgment fails on this issue. *See O'Leary v. Telecom Res. Serv., LLC*, No. 10C-03-108-JOH, 2011 WL 379300, at *4 (Del. Super. Ct. Jan. 14, 2011) (withholding judgment because of issues of material fact relating to a party's legitimate business interest in enforcing a noncompetition agreement).

### 3. *Zoning Issues*

360 Security accuses Peggy of breaching Section 3.12 of the Purchase Agreement by conveying Southern Coast to 360 Security while Southern Coast was operating with approximately 100 dogs in violation of local zoning requirements. (Doc. 60 ¶¶ 97–108). Peggy moves for summary judgment, arguing that: (1) 360 Security's claims are barred by Delaware's statute of limitations; and (2) Peggy had no actual knowledge of the at-issue zoning restriction.

The statute of limitations for breach of contract in Delaware is three years. *See* Del. Code tit. 10, § 8106. The timing "is calculated from the time of the wrongful act even if plaintiff is ignorant of the cause of action." *Armstrong v. Council of Devon*, No. CV N16C-09-026 AML, 2018 WL 1448093, at *2 (Del. Super. Ct. Mar. 23, 2018) (quoting *Lincoln Nat'l Life Ins. Co. v. Snyder*, 722 F. Supp. 2d 546, 563 (D. Del. 2010)), *aff'd*, 198 A.3d 724 (Del. 2018). Because the sale occurred in August 2020 under circumstances that allegedly violated Section 3.12 of the Purchase Agreement, the statute of limitations was set to expire in August 2023. *See Snyder*, 722 F. Supp. 2d at 563. This action was commenced on February 22, 2025 (Doc. 1)—thus, 360 Security's claim is barred unless the statute of limitations period was tolled.

"Delaware law allows the statute of limitations to be tolled '[w]here the defendant has acted to affirmatively conceal the wrong.'" *Snyder*, 722 F. Supp.

2d at 563 (quoting *EBS Litig. LLC v. Barclays Glob. Invs., N.A.*, 304 F.3d 302, 305 (3d Cir. 2002)). "Under the fraudulent concealment doctrine of tolling, a plaintiff must show that a defendant 'knowingly acted to prevent plaintiff from learning facts or otherwise made misrepresentations intended to put [] plaintiff off the trail of inquiry.'" *Id.* (alteration in original) (quoting *Krahmer v. Christie's Inc.*, 911 A.2d 399, 407 (Del. Ch. 2006)).

Pinson discovered the zoning defect in August 2020, and the parties completed the sale only after Bill assured Pinson that the zoning issue was essentially a scrivener's error that was being rectified. Peggy argues that Bill's statements cannot be imputed to her for purposes of tolling the statute of limitations.

The Court is not persuaded that Peggy is entitled to summary judgment on statute-of-limitations grounds simply because it was Bill who allegedly made the false statements to Pinson to conceal the breach. In a previous order, the Court determined that the second amended complaint "contains sufficient allegations to support an inference that Bill was [Peggy]'s 'affiliate' as defined in the Purchase Agreement." (Doc. 88 at 10). Unresolved disputes of material fact exist as to the nature of Bill's comments, whether Bill's comments to Pinson were on Peggy's behalf, and the extent to which Pinson reasonably relied on Bill's comments. *See also Litman v. Prudential–Bache Props., Inc.*, Civ. No. 12137, 1994 WL 30529, at *3 (Del. Ch. Jan. 14, 1994) (explaining that

"defendants should not be permitted to use a limitations period as a shield when they have engaged in fraudulent acts that have denied plaintiffs the opportunity to timely discover the alleged wrongs").

Peggy also argues that the Purchase Agreement requires her to possess "actual knowledge" and that she had no actual knowledge in August 2020 that Volusia County would step in in 2025 to enforce a 30-dog limit. (Doc. 113 at 16 (citing Doc. 60-1 at 13–14)). However, Peggy's knowledge of the zoning issue generally and her role in Bill's purported attempt to deceive 360 Security about the matter is disputed. Thus, Peggy is not entitled to summary judgment based on her purported lack of actual knowledge.

### B. Southern Coast's and Bill's Alleged Breaches of the Independent Contractor Agreement

In Count II, Southern Coast alleges that Bill breached the Independent Contractor Agreement by failing to transfer all of ADCA's business and his DEA license to Southern Coast. (Doc. 60 ¶¶ 109–119). And in Counterclaim Counts I and II, Bill alleges that Southern Coast breached the Independent Contractor Agreement and an oral agreement that he had with Pinson by refusing to pay Bill a greater share of Southern Coast's profits. (Doc. 97 ¶¶ 26–41). Bill moves for summary judgment on Southern Coast's claims against him, arguing that he did not violate the Independent Contractor Agreement by not transferring his DEA license to Southern Coast and that Southern Coast suffered no damages.

(Doc. 113 at 17–18). And Southern Coast moves for summary judgment on Bill's counterclaims, arguing that no actionable breach occurred and that Bill did not incur any damages. (Doc. 115 at 8–17).

Under the Independent Contractor Agreement's choice-of-law provision, Texas law governs this dispute. (*See* Doc. 97-2 at 2, 7). In Texas, a "[b]reach of contract requires pleading and proof that (1) a valid contract exists; (2) the [claimant] performed or tendered performance as contractually required; (3) the [opposing party] breached the contract by failing to perform or tender performance as contractually required; and (4) the [claimant] sustained damages due to the breach." *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 890 (Tex. 2019).

### *1. Bill's Alleged Breaches of the Independent Contractor Agreement*

The Statement of Work attached to the Independent Contractor Agreement called for Bill to "transition[] the management of operations, clients, sales in process, overseas procurement and credit lines, and dog selection, as well as any applicable DEA and other licenses and contracts." (Doc. 60-2 at 4). Southern Coast alleges that Bill breached the Independent Contractor Agreement by failing to transition ADCA's certification work and his DEA license to Southern Coast. (Doc. 60 ¶¶ 113–114).

The Court has already determined that genuine disputes of material fact exist as to ownership of ADCA. Bill's summary-judgment motion must be denied because is not clear that ADCA is part of the "operations" that the Independent Contractor Agreement tasked Bill with transitioning to Southern Coast. Moreover, there is record evidence suggesting—in the event ADCA is determined to belong to 360 Security—that Southern Coast may have suffered actual damages through Bill's operation of ADCA. (Doc. 114-4 at 24:1–27:19, 163:16–23).

As for the transfer of the DEA license, summary judgment must be granted for Bill. Southern Coast asserts that Bill maliciously withheld transfer of the license to use as leverage. (Doc. 120 at 13 (citing Doc. 113-6 ¶ 9; Doc. 113-7 ¶ 19)). But Southern Coast acquired another DEA license, and Southern Coast fails to explain how it was damaged by Bill's failure to transfer his license. (*See* Doc. 113-11 at 114). The Court will not scour the record to save this claim. *See* *Henderson v. Lockheed Martin Corp.*, No. 6:21-cv-1363, 2023 WL 9468273, at *2 n.6 (M.D. Fla. Dec. 26, 2023) (explaining that judges are not required to search a "voluminous record to save particular [p]laintiffs from summary judgment when their counsel fails to point the Court in the direction of supporting evidence"), *aff'd sub nom. Davis v. Lockheed Martin Corp.*, No. 24-10080, 2026 WL 2167835 (11th Cir. July 28, 2026); *see also Chavez v. Sec'y Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("[J]udges are not like pigs, hunting for

truffles buried in briefs." (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991))).

### 2. *Southern Coast's Alleged Breach of the Independent Contractor Agreement and the Purported Oral Agreement*

In Counterclaim Count I, Bill alleges that Southern Coast breached the Independent Contractor Agreement by "failing to pay [him] the agreed upon bonus despite making a profit under the terms of the agreement" for the years 2022 and 2023. (Doc. 97 ¶ 32). In Counterclaim Count II, Bill further alleges that he made an oral agreement with Pinson in which Southern Coast agreed to share profits. (*Id.* ¶ 40). Southern Coast moves for summary judgment, arguing that: (1) the Independent Contractor Agreement does not contain a profit-sharing obligation; (2) any oral agreement between the parties was unenforceable; and (3) Bill suffered no damages because Southern Coast was not profitable during the years in question. (Doc. 115 at 8–17).

#### a. **Counterclaim Count I: Breach of Independent Contractor Agreement**

The Independent Contractor Agreement states that "[i]n exchange for [Bill]'s obligations under this Agreement, [Southern Coast] shall pay [Bill] the fees set forth in the applicable [Statement of Work]," (Doc. 97-2 at 1), which is attached as Exhibit A to the Independent Contractor Agreement, (*id.* at 3–4). In the section of the Statement of Work labeled "Consultancy Hours and Fees," the parties agreed that "[Bill]'s hours and rates shall be as pursuant to the Letter

of Intent dated September 24, 2021." (*Id.* at 4), Thus, the Statement of Work incorporates the September 24, 2021 Letter of Intent insofar as it addresses Bill's "*hours* and *rates*." (*Id.* (emphasis added)).

The section of the Letter of Intent labeled "Compensation" states:

> Mr. Heiser shall continue to receive an annual salary of $75,000.00 per annum until such time that he works, on average, no more than three 8-hour workdays . . . each calendar week. The parties intend for Mr. Heiser to work four or five workdays until December 31, 2021 (as needed), or until such time as his replacement is hired and trained. After such time, the parties intend for Mr. Heiser to work three or four days per week, or as needed, until Mr. Heiser is no longer employed or upon agreement of the parties. In addition[] to his salary, the parties intend to provide Mr. Heiser with a profit-share of 50% based on the weighted average of both the prior quarter and the prior 12 months, which may be paid as a bonus. The calculation of the profit share, the working capital threshold, and the means for Jason Pinson to recoup his initial investment shall be agreed upon by the parties after the final accounting reconciliation is complete, which shall be no later than December 31, 2021. Mr. Heiser will continue to receive such profit share as bonus compensation until either such date as he is no longer employed with the company.

(*Id.* at 5).

To incorporate a document by reference, "the referring language in the original document must demonstrate the parties intended to incorporate all or part of the referenced document." *Bob Montgomery Chevrolet, Inc. v. Dent Zone Cos.*, 409 S.W.3d 181, 190 (Tex. App. 2013). "To be enforceable, a contract must address all of its essential and material terms with 'a reasonable degree of

certainty and definiteness.'" *Fischer v. CTMI, LLC*, 479 S.W.3d 231, 237 (Tex. 2016) (quoting *Pace Corp. v. Jackson*, 284 S.W.2d 340, 345 (Tex. 1955)). "[U]nder Texas law, material and essential terms are those that parties would reasonably regard as 'vitally important ingredient[s]' of their bargain." *Id.* (second alteration in original) (quoting *Neeley v. Bankers Tr. Co.*, 757 F.2d 621, 628 (5th Cir. 1985)). "The material terms of a contract are determined on a case-by-case basis." *McCalla v. Baker's Campground, Inc.*, 416 S.W.3d 416, 418 (Tex. 2013) (citing *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992)).

Bill asserts that the Statement of Work incorporated the Letter of Intent's terms pertaining to Bill Heiser's "compensation." (Doc. 119 at 9). But in fact, the Statement of Work incorporates only the Letter of Intent's designations as to "hours and rates"—not necessarily to Bill's compensation writ large. (*See* Doc. 97-2 at 4). Bill does not explain how the profit-sharing agreement could constitute "hours" or "rates." The Independent Contractor Agreement does not otherwise provide for profit sharing. (*See* Doc. 97-2 at 1).

Even assuming that the profit-sharing provision in the Letter of Intent was incorporated into the Independent Contractor Agreement, the provision is unenforceable because it leaves material terms open to future negotiation. Under Texas law, a contract "'must specify all its material and essential terms, and leave none to be agreed upon as the result of future negotiations.'" *Fischer*,

479 S.W.3d at 237 (quoting *Radford v. McNeny*, 104 S.W.2d 472, 475 (Tex. Comm'n App. 1937)). Regarding profit-sharing, the Letter of Intent is replete with indefinite language. First, the Letter of Intent is equivocal about whether the parties have entered into an agreement, stating only that Southern Coast "intend[s]" to pay Bill a share of profits that "may be" issued as a bonus. (Doc. 97-2 at 5). Next, the Letter of Intent explicitly reserves key aspects of the profit-sharing arrangement for future agreement, stating that "[t]he calculation of the profit share, the working capital threshold, and the means for Jason Pinson to recoup his initial investment *shall be agreed upon by the parties* after the final accounting reconciliation is complete, which shall be no later than December 31, 2021." (*Id.* (emphasis added)). In holding open for future agreement these essential terms, the contract does not provide the Court with an adequate means to assess the parties' performance or to determine damages. Therefore, the provision is unenforceable. *See Ft. Worth Indep. Sch. Dist. v. City of Ft. Worth*, 22 S.W.3d 831, 847 (Tex. 2000) (explaining that the basis for calculating the amount of future payments is an essential term that cannot be held open for future agreement).

Accordingly, summary judgment must be granted in favor of Southern Coast on Bill's Counterclaim Count I for breach of the Independent Contractor Agreement, as Bill's purported right to profit sharing does not arise under the Independent Contractor Agreement.

### b. Counterclaim Count II: Breach of Oral Agreement

Bill also alleges that he is entitled to profit sharing pursuant to a June 2021 oral agreement with Pinson. (Doc. 97 ¶ 35; Doc. 115-2 ¶ 7; Doc. 115-3 at 110:23–111:5). Bill claims that he received three separate payments under that oral agreement—$75,000, $50,000, and $25,000, respectively—for a total of $150,000, which he claims was less than 50% of Southern Coast's profits for 2021. (Doc. 119-8 ¶¶ 6–10). Bill claims that Southern Coast still owes him an additional $20,500 in profits for 2021 and that he was not paid a share of Southern Coast's profits for 2022 and 2023, which he contends "should have stayed relatively the same" as 2021. (*Id.* ¶¶ 10–13). Southern Coast acknowledges that Bill received a $75,000 bonus in 2021, though Pinson claims that the bonus was discretionary and was not required under any alleged oral agreement. (*See* Doc. 119-6 at 52:3–12).

Under *lex loci contractus*, oral contracts "are considered 'made' in the state in which the oral agreement was reached." *Motmanco, Inc. v. McDonald's Corp.*, No. 3:04-cv-270-J, 2005 WL 1027261, at *3 (M.D. Fla. Mar. 30, 2005). The parties do not dispute that Florida law applies to the purported oral agreement. (*See* Doc. 115 at 16–17; Doc. 119 at 10–11). "An oral contract is subject to the basic requirements of contract law such as offer, acceptance, consideration, and sufficient specification of essential terms." *In re Std. Jury Instructions-Contract*

*& Bus. Cases*, 116 So. 3d 284, 307 (Fla. 2013) (citing *St. Joe Corp. v. McIver*, 875 So. 2d 375, 381 (Fla. 2004)).

The parties dispute whether the oral agreement is sufficiently definite. Under Florida law, "where essential terms of an agreement remain open, and subject to future negotiation, there can be no enforceable contract." *Certified Motors, LLC v. Aventine Hill, LLC*, 369 So. 3d 1254, 1258 (Fla. 2d DCA 2023) (quoting *Dows v. Nike, Inc.*, 846 So. 2d 595, 602 (Fla. 4th DCA 2003)).[4] But "[a]s long as an essential ingredient is not missing from an agreement, courts have been reluctant to hold contracts unenforceable on grounds of uncertainty, especially where one party has benefited from the other's reliance." *In re Standard Jury Instructions--Contract & Bus. Cases*, 116 So. 3d 284, 307 (Fla. 2013) (citing *Gulf Solar, Inc. v. Westfall*, 447 So. 2d 363 (Fla. 2d DCA 1984), and *Cmty. Design Corp. v. Antonell*, 459 So. 2d 343 (Fla. 3d DCA 1984)).

Here, record evidence exists to create a genuine dispute of material fact as to whether Bill was entitled to profit-sharing pursuant to an oral agreement. Partial payment under an oral contract can be evidence that the parties agreed to sufficiently material terms. *See Salt Creek Boats, Inc. v. Brodeur*, No. 8:07-cv-1772-T, 2010 WL 454912, at *4 (M.D. Fla. Feb. 9, 2010). Whether the bonuses

[4] "A federal court applying state law is bound to adhere to decisions of the state's intermediate appellate courts absent some persuasive indication that the state's highest court would decide the issue otherwise." *Silverberg v. Paine, Webber, Jackson & Curtis, Inc.*, 710 F.2d 678, 690 (11th Cir. 1983).

Bill received were discretionary or required by the oral agreement is genuinely disputed.

Southern Coast also claims that summary judgment is warranted because it was not profitable during the years in question. Although Southern Coast claims that the "financial records are dispositive," Southern Coast does not provide its financial records, instead referencing only Pinson's declaration stating that Southern Coast was not profitable in 2022 or 2023. (Doc. 115 at 15 (citing Doc. 115-2 ¶ 6)). In his affidavit, Bill claims that Southern Coast must have been profitable based on his "actual knowledge of the sales and expenses for [Southern Coast] from 2021 until . . . September [] 2023." (Doc. 119-8 ¶¶ 11–13). Because neither party provides Southern Coast's financial records or a good reason to prefer either Pinson's or Bill's testimony on the issue, the Court cannot enter summary judgment. *See Abellan v. Wachovia Bank, N.A.*, No. 08-22599-CV, 2009 WL 2579045, at *1 (S.D. Fla. Aug. 20, 2009) (explaining that competing affidavits and depositions can demonstrate that genuine issues of material fact remain in dispute).

### C. Bill's Conversion and Unjust Enrichment Counterclaims

In Counterclaim Counts IV and V, Bill alleges that Southern Coast and 360 Security engaged in conversion through their unauthorized use of Bill's DEA and FDLE numbers on Southern Coast-issued certificates and that Plaintiffs were unjustly enriched by their use of Bill's information. (*See* Doc. 97

¶¶ 67–77). During his tenure at Southern Coast, Bill authorized Southern Coast to insert his DEA and FDLE numbers in the lower left-hand corner of Southern Coast-issued certificates. (Doc. 115-1 ¶¶ 6, 8; Doc. 115-3 at 156:24–158:3). After Bill stopped doing work for the company, Southern Coast continued to issue the same certificates until Bill complained. (Doc. 115-8 at 73:18–77:3). Southern Coast claims that its inclusion of Bill's DEA and FDLE numbers on Southern Coast-issued certificates was inadvertent, that Southern Coast gained nothing from doing so, that Bill lost nothing through their use, and that Southern Coast promptly removed Bill's information from the certificates after he complained. (Doc. 115 at 19–20).

In general, three factors must be present for initially permissive use of property to become a conversion: "first, the party in possession must be informed that continued possession of the property is no longer permitted; second, the rightful owner must demand the return of the property; and third, the party holding the property must fail to comply with the demand." *Beach Cmty. Bank v. Disposal Servs., LLC*, 199 So. 3d 1132, 1134 (Fla. 1st DCA 2016) (citing *Black Bus. Inv. Fund of Cent. Fla., Inc. v. State, Dep't of Econ. Opportunity*, 178 So. 3d 931 (Fla. 1st DCA 2015)).

Here, it is undisputed that Bill permitted Southern Coast to use his DEA and FDLE numbers on certificates during his tenure at Southern Coast and that Southern Coast ceased using Bill's information on its certificates after Bill

complained. (Doc. 115-1 ¶¶ 8–10; Doc. 123-3 at 153:9–14). Because Southern Coast initially had permission to use Bill's information and ceased using it upon Bill's request, no conversion occurred. And because there is no genuine dispute that Southern Coast did not convert Bill's property, summary judgment in favor of 360 Security—whose purported liability is based on its alleged "acquiesce[nce] accept[ance], and participat[ion]" in Southern Coast's conversion of Bill's DEA and FDLE numbers—is also warranted. (Doc. 118 at 9–10). *See Marine Transp. Servs. Sea-Barge Grp., Inc. v. Python High Performance Marine Corp.*, 16 F.3d 1133, 1140 (11th Cir. 1994) (explaining that under Florida law, conversion pertains to the wrongful deprivation of property, not its mere acquisition).

Bill also alleges that Plaintiffs were unjustly enriched by their unauthorized use of his DEA and FDLE numbers. To establish unjust enrichment, a party must show that: (1) a benefit was conferred upon the allegedly enriched party, (2) the enriched party either requested the benefit or voluntarily accepted it, (3) a benefit flowed to the enriched party, and (4) it would be inequitable for the enriched party to retain the benefit without paying for it. *W.R. Townsend Contracting, Inc. v. Jensen Civil Constr., Inc.*, 728 So. 2d 297, 303 (Fla. 1st DCA 1999).

Here, there is no evidence that Plaintiffs accepted or retained any benefit from their use of Bill's DEA and FDLE numbers. (Doc. 115-1 ¶¶ 9–10; Doc. 115-8 at 73:18–77:3). After Bill stopped doing work for the company, Southern Coast

continued to issue the certificates in the same format as it did before Bill's departure. Upon Bill's request, Southern Coast ceased incorporating his information into its certificates. (Doc. 115-8 at 73:18–77:3). There is no record evidence that including Bill's information on the certificates provided any value to Southern Coast. (*See* Doc. 115-6 at 27:21–29:9; Doc. 115-7 at 66:20–67:3; Doc. 115-8 at 76:4–77:3). Summary judgment must therefore be granted in Plaintiffs' favor on Bill's unjust-enrichment counterclaims. *See CMH Homes, Inc. v. LSFC Co., LLC,* 118 So. 3d 964, 966 (Fla. 1st DCA 2013) (granting summary judgment where no record evidence showed that "any benefit was either requested or knowingly and voluntarily accepted").

### D. Plaintiffs' Breach-of-Fiduciary-Duty Claims

In Count III, 360 Security lodges breach-of-fiduciary-duty claims against Bill and Peggy arising from their purported misrepresentation of Southern Coast's foreign-national employees' legal status and their alleged practice of illicitly modifying canine passports. (Doc. 60 ¶¶ 120–26). In Count IV, Southern Coast brings its own breach-of-fiduciary-duty claims against Bill, alleging that Bill engaged in unethical acts in his capacity as president of Southern Coast that harmed Southern Coast's business. (*Id.* ¶¶ 127–32). The Heisers move for summary judgment on both counts. (Doc. 113 at 18–21).

"The elements of a claim for breach of fiduciary duty are: the existence of a fiduciary duty, and the breach of that duty such that it is the proximate cause

of the plaintiff's damages." *Gracey v. Eaker*, 837 So. 2d 348, 353 (Fla. 2002). "[O]ne in such a fiduciary relationship is subject to legal responsibility for harm flowing from a breach of fiduciary duty imposed by the relationship." *Id.*

*1. 360 Security's Claims Against Bill and Peggy*

The parties do not dispute that the Heisers owed 360 Security a fiduciary duty from August 2020 until 2022, when Bill entered into the Independent Contractor Agreement. (*See* Doc. 113 at 19, Doc. 120 at 14). Although some of the harms 360 Security alleges from the Heisers' purported breaches did not manifest until after the Heisers had stopped doing work for Southern Coast, that alone does not necessarily bar 360 Security's claims. *See Gracey*, 837 So. 2d at 353.

The Heisers acknowledge that "[i]t is undisputed that Bill represented that the non-immigrants were lawfully on the property for a training program." (Doc. 121 at 7). However, Bill argues that he told 360 Security that the undocumented workers were present on student visas—not work visas—and that therefore no breach of fiduciary duty occurred. (*Id.*).

The Heisers' argument is unpersuasive. Bill admits to informing Liepold that Southern Coast's foreign-national employees were lawfully on the property. That he did not go so far as to falsely state that these employees were on a work-visa program is not a compelling reason to enter summary judgment. *See Fla. Coastal Sch. of Law, Inc. v. Cardona*, No. 3:21-cv-721, 2021 WL 3493311, at *23

(M.D. Fla. Aug. 9, 2021) (finding that "statements that were misleading or half-truths" could form the basis of a breach-of-fiduciary-duty claim).

The Heisers also claim that 360 Security "willfully ignored conduct they believed to be unlawful for years in order to earn a profit" and "only complained after they were reprimanded." (Doc. 121 at 6). Liepold's company, Liepold, Harrison & Associates, assumed control over Southern Coast's accounting and human resources in 2021 and thus could potentially have uncovered Southern Coast's employees' undocumented status long before the federal human-trafficking inquiry against Southern Coast. (*See* Doc. 113-4 at 12:18–20, 18:24–19:23).

Liepold testified in her deposition that in 2021 she "noticed that there was missing documentation" and "started to request it from Bill" but was repeatedly "provided with promises that the information was forthcoming." (Doc. 120-4 at 28:7–17). Liepold claims that Bill promised her that the undocumented employees were present as part of a visa education program. (*Id.*; Doc. 120-3 ¶¶ 14–16). Former Southern Coast employees Tony Silva and Chantal Murray also stated in affidavits that Bill represented that the foreign-national employees were lawfully present on a visa program. (*See* Doc. 120-6 ¶¶ 12–14; Doc. 120-7 ¶¶ 3–5). Silva stated that Liepold was not aware that Southern Coast's foreign-national employees were undocumented until the U.S. Department of State's visit to the Southern Coast facility in Fall 2023. (Doc.

120-6 ¶ 16). And Liepold, Harrison & Associates' former corporate comptroller, Natalie Nicodemus, testified in her deposition that she questioned Bill about the independent contractors, and he assured her that they were on a visa program. (Doc. 120-1 at 83:15–21).

Although ratification can be a defense to a breach-of-fiduciary-duty claim, the extent of Liepold's knowledge is disputed. *See Pleasant Valley Biofuels, LLC v. Sanchez-Medina*, No. 13-23046-CIV, 2014 WL 11881019, at *2 (S.D. Fla. Nov. 21, 2014). 360 Security has shown a genuine dispute of material fact exists as to the falsity of Bill's representations about Southern Coast's foreign-national employees' legal status and whether Liepold reasonably relied on Bill's representations. Although Liepold potentially could have uncovered the issue had she exercised greater vigilance, that fact alone does not warrant entry of summary judgment against 360 Security.

The Heisers also move for summary judgment on the canine-passport issue, arguing that 360 Security ratified the practice of altering canine passports by continuing to alter them after Bill left the company. Southern Coast employee Newton Villalona testified in his deposition that he alters canine passports to remove vendor information to conceal from the client where Southern Coast purchased the dogs. (Doc. 113-10 at 28:24–25:5). 360 Security does not address this issue in its response.

Although it is unclear what damages 360 Security is claiming it suffered as a result of Bill's alleged canine passport modification, the Heisers also fail to explain how another Southern Coast employee altering canine passports means that Bill could not have breached a fiduciary duty. The Heisers' summary-judgment motion is therefore denied. *See Polypack, Inc. v. Nestle USA, Inc.*, No. 8:23-cv-318-SPF, 2025 WL 676253, at *8 (M.D. Fla. Mar. 3, 2025) (denying summary judgment where an issue was not adequately briefed by the parties).

2. *Southern Coast's Breach-of-Fiduciary-Duty Claims Against Bill*

Southern Coast accuses Bill of multiple other acts of misconduct during his tenure as president of Southern Coast from August 2020 until June 2022, including that he refused to raise prices, provided his favorite customers with unauthorized discounts, gave away dogs, took inflated bonuses, concealed debts, used Southern Coast's resources for his personal endeavors, underbid contracts, engaged in side deals and kickbacks, colluded with a canine seller to raise the price of dogs by $500, and turned away business. (Doc. 113 at 18–21). Bill argues that his summary-judgment motion should be granted because aside from Silva's and Murray's affidavits (Docs. 120-6 & 120-7), Southern Coast has not produced evidence in support of these allegations.

Southern Coast relies on Silva's and Murray's affidavits as evidence of a genuine dispute of material fact as to Bill's alleged misdeeds during his tenure

as president of Southern Coast. Silva states that Bill instructed him to keep Liepold and Pinson in the dark as to Southern Coast's finances and that Bill was causing Southern Coast to pay an upcharge on dogs purchased from sellers in Germany for purposes of obtaining kickbacks. (Doc. 120-6 ¶ 20). Murray states that Bill also instructed her to withhold information from Pinson and Liepold. (Doc. 120-7 ¶¶ 6–10). Murray claims that during her weekly financial meetings with Bill, she observed Bill pull cash from Southern Coast's accounts for his personal use, give himself improper raises, use Southern Coast's employees to work on his personal projects during Southern Coast's business hours and, on one occasion, sell a Southern Coast dog off the books for $25,000, keeping the proceeds for himself. (*Id.* ¶¶ 11–19). Southern Coast does not point to other record evidence of Bill's misconduct.

"Supporting and opposing affidavits shall be made on personal knowledge." Fed. R. Civ. P. 56(e). "Rule 56(e)'s personal knowledge requirement prevents statements in affidavits that are based, in part, 'upon information and belief'—instead of only knowledge—from raising genuine issues of fact sufficient to defeat summary judgment." *Pace v. Capobianco*, 283 F.3d 1275, 1278 (11th Cir. 2002) (citing *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 851 (11th Cir. 2000), *Fowler v. Southern Bell Tel. & Tel. Co.*, 343 F.2d 150, 154 (5th Cir. 1965), and *Robbins v. Gould*, 278 F.2d 116, 118 (5th Cir. 1960). "Even if the affidavit is otherwise based upon personal knowledge . . . a statement that the

affiant believes something is not in accordance with the Rule." *Id.* (citing *Cermetek, Inc. v. Butler Avpak, Inc.*, 573 F.2d 1370, 1377 (9th Cir. 1978)). Affidavits that set forth conclusory arguments rather than statements of fact based on personal knowledge are improper. *See Story v. Sunshine Foliage World, Inc.*, 120 F. Supp. 2d 1027, 1030 (M.D. Fla. 2000).

Although Bill suggests otherwise, Silva and Murray have adequate personal knowledge to show that a factual dispute exists as to Bill's: (1) unauthorized withdrawal of funds from Southern Coast's account; (2) purported use of Southern Coast's resources to perform work on his personal projects; (3) alleged collusion with other canine sellers so that he could gain kickbacks at Southern Coast's expense; and (4) alleged unauthorized off-the-books sale of a Southern Coast dog. Therefore, summary judgment must be denied insofar as Southern Coast's breach-of-fiduciary-duty claim encompasses these issues. However, Silva's and Murray's affidavits provide no support for many of Southern Coast's allegations, including that Bill: (1) refused to raise prices; (2) gave unauthorized discounts and free dogs to his preferred customers; (3) concealed Southern Coast's debts; (4) underbid contracts; and (5) turned away business from Southern Coast. Accordingly, summary judgment will be granted as to these unsupported allegations.[5] *See Am. Mgmt. Corp. v. Dunlap*, 784 F.

---

[5] Evidence of Bill's alleged misconduct relating to these allegations may still be admissible at trial under Federal Rule of Evidence 404(b).

Supp. 1245, 1251 (N.D. Miss. 1992) ("To preclude summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial." (quoting *Broadway v. Montgomery*, 530 F.2d 657, 660 (5th Cir.1976))).[6]

### E. Plaintiffs' Fraud Claims Against Bill

In Counts V and VI, Plaintiffs allege they were defrauded when Bill misrepresented to Liepold that Southern Coast's foreign-national employees were lawfully present at the Southern Coast facility on a visa program. (Doc. 60 ¶¶ 135, 149). Plaintiffs allege that because of Bill's misrepresentations, Plaintiffs became subject to a federal human-trafficking investigation, which required Plaintiffs to terminate many employees and thereby prevented Plaintiffs from performing under the INL contract. (Doc. 120-2 at 62:24–63:3). The human-trafficking inquiry purportedly forced Plaintiffs into a "fire sale" of Coast to Coast. (Doc. 60 ¶ 144). Bill moves for summary judgment, arguing that as "sophisticated business owners," Liepold and Pinson could not have reasonably relied on Bill's representations. (Doc. 113 at 22).

In Florida, "the essential elements of a fraud claim are: '(1) a false statement concerning a specific material fact; (2) the maker's knowledge that

[6] Decisions by the Fifth Circuit issued before October 1, 1981, are binding as precedent in the Eleventh Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

the representation is false; (3) an intention that the representation induces another's reliance; and (4) consequent injury by the other party acting in reliance on the representation." *State Farm Mut. Auto. Ins. Co. v. Weiss*, 410 F. Supp. 2d 1146, 1159 (M.D. Fla. 2006) (quoting *Wadlington v. Cont'l Med. Servs., Inc.*, 907 So. 2d 631, 632 (Fla. 4th DCA 2005)). "Generally, the issue of fraud is not properly the subject of summary judgment, because a resolution of the issues involved requires an exploration of the relevant facts and circumstances, and thus a court can seldom determine the presence of fraud absent a trial or evidentiary hearing." *Id.* (citing *Robinson v. Kalmanson*, 882 So. 2d 1086, 1088 (Fla. 5th DCA 2004), and *Amazon v. Davidson*, 390 So. 2d 383, 385 (Fla. 5th DCA 1980)).

Summary judgment is not warranted in favor of Bill on Plaintiffs' fraud claims. As previously discussed, Plaintiffs have shown that a genuine dispute of material fact exists as to whether Liepold reasonably relied on Bill's statements about Southern Coast's foreign-national employees' legal status. These are classic questions of credibility that a court is unable to determine at summary judgment. And although Liepold's and Pinson's relative sophistication is a factor when assessing reasonable reliance, it is not necessarily dispositive. *See Gonzalez v. Indep. Order of Foresters*, No. 24-10758, 2025 WL 337898, at *4 (11th Cir. Jan. 30, 2025) ("Whether reliance was justified is a factual determination depending on 'the totality of the circumstances surrounding the

type of information, the nature of the communication between the parties, and the relative positions of the parties.'" (quoting *M/I Schottenstein Homes, Inc. v. Azam*, 813 So. 2d 91, 95 (Fla. 2002))).[7]

### F. Southern Coast's Tortious Interference Claim Against Bill

In Count VII, Southern Coast alleges that Bill tortiously interfered with Southern Coast's contracts by siphoning Disney's certification business away from Southern Coast and by disclosing the details of Southern Coast's contract with MSC Cruises to the owner of another canine business, Tony Guzman, allowing Guzman to underbid Southern Coast. (Doc. 60 ¶¶ 161, 165–66). Bill moves for summary judgment, arguing that Southern Coast has not produced evidence that it did not receive payment for any services it rendered for Disney and that Liepold—not Bill—provided Guzman with financial information regarding Southern Coast's MSC Cruises contract.

"In Florida, the elements of tortious inference with contractual relations are: (1) the existence of a contract; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the contract's breach; (4) absence of any justification or privilege; and (5) damages resulting from the breach." *Westgate Resorts, Ltd. v. Sussman*, 387 F. Supp. 3d 1318, 1349 (M.D. Fla. 2019)

---

[7] In the Eleventh Circuit, "unpublished decisions . . . bind no one," *Ray v. McCullough Payne & Haan, LLC*, 838 F.3d 1107, 1109 (11th Cir. 2016), but "may be cited as persuasive authority," 11th Cir. R. 36-2.

(citing *Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1322 (11th Cir. 1998)). "Imbedded within these elements is the requirement that the plaintiff establish that the defendant's conduct caused or induced the breach that resulted in the plaintiff's damages." *Id.* (quoting *Chi. Title Ins. v. Alday-Donalson Title Co. of Fla.*, 832 So. 2d 810, 814 (Fla. 2d DCA 2002)).

Southern Coast alleges that after Bill stopped working for Southern Coast, he opened a separate vendor account with Disney under ADCA, began issuing invoices to Disney under ADCA, and directed payment toward himself without including Southern Coast. (Doc. 120-3 ¶ 12). In so doing, Bill purportedly induced Disney to bring Bill business that otherwise would have gone to Southern Coast. (Doc. 120 at 17–18). Bill does not challenge the existence of a contract between Southern Coast and Disney or his knowledge of the contract. Instead, Bill argues that he is entitled to summary judgment because ADCA performed certifications for Disney while Bill was at Southern Coast and that no breach occurred when ADCA continued to perform certifications after Bill left Southern Coast.

Bill's contentions do not provide grounds for granting summary judgment in his favor. If ADCA is found to be 360 Security's property, Southern Coast could ultimately prevail on its tortious-interference claim. Bill does not dispute that he created a new vendor account with Disney under ADCA and began circulating invoices and collecting payments from Disney. If ADCA is 360

Security's property, Disney's business arguably would have flowed to Southern Coast. Thus, a genuine dispute of material fact exists as to whether Bill induced Disney to breach a contract with Southern Coast and whether and to what extent Southern Coast was harmed as a result. *See also Border Collie Rescue, Inc. v. Ryan*, 418 F. Supp. 2d 1330, 1344 (M.D. Fla. 2006) (denying summary judgment on claim for tortious interference even when the validity of the contract forming basis of the relationship is disputed).

As to the MSC Cruises allegations, Bill baldly states without citation to the record that Liepold and Pinson had final say over the sale of the MSC Cruises contract and that any financial information provided to Guzman was provided by Liepold. (Doc. 113 at 23). For its part, Southern Coast does not address the MSC Cruises issue in response. The parties have given the Court nothing with which to evaluate this claim; therefore, summary judgment will be denied. *See Polypack, Inc.*, 2025 WL 676253, at *8.

### G. Southern Coast's Conversion Claim Against the Heisers

In Count VIII, Southern Coast alleges that: (1) Bill stole ADCA and used it to steal away certification business from Disney; (2) the Heisers wrote tens of thousands of dollars' worth of checks to themselves from Southern Coast's operating account; (3) Bill used Southern Coast's resources for his personal projects; and (4) the Heisers transferred funds from Southern Coast's Square

account to their personal bank account after the Brevard County Seminar. (Doc. 60 ¶¶ 172–182).

In Florida, "a conversion has been defined as being an act of dominion wrongfully asserted over another's property inconsistent with his ownership of it." *Goodrich v. Malowney*, 157 So. 2d 829, 831 (Fla. 2d DCA 1963). "It is axiomatic that a plaintiff must prove damages resulting from the defendant's wrongdoing to be entitled to recover." *Regions Bank v. Maroone Chevrolet, LLC*, 118 So. 3d 251, 257 (Fla. 3d DCA 2013) (citing *Bank of Miami Beach v. Newman*, 163 So. 2d 333, 333 (Fla. 3d DCA 1964)).

For the reasons previously explained, the ownership of ADCA and the allegations that the Heisers improperly removed funds from Southern Coast's accounts and inappropriately used Southern Coast's resources for personal gain are genuinely disputed. The Heisers have not shown that Southern Coast could not prevail on a conversion claim based on proof of these claims; therefore, the Heisers' motion for summary judgment must be denied.

The remaining issue is the Square Account. The Heisers argue that Bill worked with Sergeant Jerry Shealy—not Southern Coast—to put on the seminar and that proceeds for the event were to be sent to the Brevard County Sheriff's Office. Bill claims that he took over the credit-card payments for the seminar only after the Sheriff's Office encountered technical difficulties in accepting payment. Although Bill labeled the Square Account "Southern Coast

K9 Seminar" (Doc. 113 at 24–25), the Heisers maintain that no Southern Coast employee worked the seminar and that Bill purchased all of the seminar's merchandise. (Doc. 113 at 24–25). However, Liepold testified in her deposition that Southern Coast employees did work the seminar, (Doc. 120-4 at 53:7–9), and that Bill had no right to transfer the seminar funds collected in Southern Coast's Square Account to Bill's personal bank account. (*See* Doc. 120-9 at 197:24–211:25).

The nature of Bill and Southern Coast's relationship with the Brevard County Seminar is unclear. The dispute about Southern Coast's employees' involvement and whether Bill improperly transferred registration fees from Southern Coast's account to his own personal account is sufficient to demonstrate that a dispute of fact exists. Accordingly, summary judgment must be denied on this ground as well.

## IV. CONCLUSION

For the reasons explained above, it is **ORDERED** and **ADJUDGED** as follows:

1. The Heisers' motion for summary judgment (Doc. 113) is **GRANTED in part**. Summary judgment is granted in favor of the Heisers as to: (a) Southern Coast's claim for breach of the Independent Contractor Agreement insofar as it pertains to Bill's failure to transfer his DEA license (Count II); and (b) Southern Coast's breach-of-fiduciary duty claims against Bill

as it pertains to his alleged refusal to raise prices, granting unauthorized discounts and free dogs to his preferred customers, concealing Southern Coast's debts, underbidding contracts, and turning away business from Southern Coast (Count IV). In all other respects, the motion (Doc. 113) is **DENIED**.

2. 360 Security's motion for summary judgment (Doc. 114) is **DENIED**.

3. Southern Coast's motion for summary judgment (Doc. 115) is **GRANTED in part**. Summary judgment is entered in favor of Southern Coast as to: (a) Bill's counterclaim for breach of contract insofar as it pertains to his entitlement to profit sharing under the Independent Contractor Agreement (Counterclaim Count I); (b) Bill's conversion counterclaim (Counterclaim Count IV); and (c) Bill's unjust enrichment counterclaim (Counterclaim Count V). In all other respects, the motion (Doc. 115) is **DENIED**.

**DONE** and **ORDERED** in Orlando, Florida, on September 23rd, 2026.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record